# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CR 306 CEJ / DDN |
| | ) | |
| PAUL BECKMANN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). An evidentiary hearing on the motions was held on November 21, 2013, and a supplemental evidentiary hearing was held on January 24, 2014.

Pending for disposition are the motions of defendant Paul Beckmann (1) to suppress evidence generally (Doc. 13 oral motion); (2) to suppress statements (Doc. 27); and (3) to suppress physical evidence (Doc. 28). Also pending is the government's oral motion for a determination by the court of the admissibility or not of any arguably suppressible evidence (Doc. 12).

From the evidence adduced during the original and supplemental evidentiary suppression hearings, the undersigned makes the following findings of fact and conclusions of law:

## FACTS
## Sex offender registration requirements

1. In Case No. 4:01 CR 59 ERW, defendant Paul A. Beckmann pled guilty on February 9, 2001 to one count of possession of child pornography.  On April 27, 2001, he was sentenced to 15 months incarceration, to be followed by 3 years supervised release.  The conditions of Beckmann's supervised release included the following:

> The defendant shall submit his person, residence, office or vehicle to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a [search] may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

See  Gov. Ex. 6, Case No. 4:01 CR 59 (Doc. 14.)   On August 2, 2011, Beckmann was no longer on federal supervised release or under any federal court imposed condition of supervision.

2. Because of his federal conviction for possessing child pornography, in August 2011 Paul A. Beckmann registered as a sex offender with the Sheriff of Jefferson County, Missouri, where he resided, as required by the Revised Statutes of Missouri §§ 589.400, 589.407, 589.414, and 589.425.  The registration process required Beckmann to provide the Sheriff of Jefferson County with information that included his residence address.

3. a. On July 12, 2011, Beckmann completed and signed a Missouri State Highway Patrol Missouri Sex Offender Registration form.  He did this in the Jefferson County Sheriff's Office before Ms. Dawn Davison, the Jefferson County Sheriff's Office Victim Services Coordinator, who handles all sex offender registration for that county.  This form indicated that he resided at 2842 Glen Haven, Arnold, Missouri.  This is within Jefferson County.  Gov. Ex. 7.  This form contained 14 obligations of such a registrant.

Among them was the following: "12. I understand that there may be duties or restrictions in addition to those listed in this notification. I understand that it is my obligation to know and comply with all duties or restrictions applicable to me, including those not listed above." Id. at 3. This section of the form is intended to refer to any conditions required by the Missouri Board of Probation and Parole. Missouri state law requires Beckmann to re-register every 90 days in person at the Jefferson County Sheriff's Office.

  b. The Jefferson County Sheriff's Office provided Beckmann a form captioned, "OFFENDER REGISTRATION INFORMATION," Defendant's Exhibit F. This form provides the offender certain information about his or her sex offender registration obligations. It provides in relevant part:

> You are required by Federal Law to register as an offender—each state has its own laws regarding registration. In Missouri you are required to update your registration every 90 days . . . if the victim was under the age of 18. You are required to register semi-annually . . . if the victim was over the age of 18.
>
>    * * *
>
> A deputy will come to your home to verify your address at least one time per year, they will speak to whoever is at home at the time and may ask to see a piece of mail to verify residency.
>
> If you are more than two weeks late with updating registration, we will begin the process of requesting charges with the Prosecuting Attorney's Office. We will also request charges if you move and fail to inform this office of such move, regardless of whether you are registered in the new jurisdiction. Failure to register is a Class D felony.

Def. Ex. F.

  4. The Jefferson County Sheriff's Office endeavors to verify the addresses of all persons in the county on the sex offender registry and that to verify the subjects are otherwise complying with Missouri law. This is accomplished by deputy sheriffs personally visiting the residence of each listed offender. An informal protocol calls for

the deputy to knock on the door and verify that the dwelling is the subject's residence. The deputy is to ask for some identification document for further verification. Sometimes offenders are not truthful about their residences. When the deputies perform residence verification as part of their regular duties, they are subject to being dispatched from performing that duty to other law enforcement activity; also, the offenders might not be at home. In such circumstances, the deputies might not complete their lists of subjects to verify that day. If a subject fails to cooperate or if the deputies are unable to verify the listed offender's residence, the officers fill out a form to document what happened when they visited the residence.

5.     In August 2011, the United States Marshals Service offered local law enforcement agencies in Missouri a program of support and funding for sex offender verification operations. In this program the Marshals Service would provide some federal personnel for a county's verification operation and would pay the local agency's cost of detailing county officers to perform solely sex offender residence verification duty for a limited period of time. In this program, teams of federal and local officers would endeavor to verify the residences of many registered offenders in a short period of time. The Jefferson County Sheriff's Office decided to participate in this federal program.

6.     In Jefferson County, the joint federal-county operation was conducted on August 2, 3, and 4, 2011. Around 6:00 or 7:00 a.m. on August 2, the participating officers and deputy marshals met and were briefed on the operation. They were divided into ten teams of two officers. Each team was assigned a specific area of the county and was given a separate list of sex offenders to verify. Each list had the names, addresses, and photographs of the registered offenders.

7.     At this briefing the officers were given an unwritten, orally stated protocol to follow. The main goal of each visit was to verify the offender's residence. Each team of two officers was to approach the front door of a listed residence, knock on the door,

and ask whether the named registered offender resided there and to see a document, such as a piece of mail, that would verify the residence. But, because the officers were also interested in whether the subjects were complying with other supervision requirements or whether they were then violating the law, the officers discussed asking the subjects if they could enter the residence (using words to the effect of "May we come in?") to verify that the subject resided there. There were printed consent forms available to the officers. The officers were advised they could ask if there were computers in the residence and whether the officers could view them ("Do you have any computers? May we see them?"). The officers were not directed to enter forcibly if a resident resisted entry. The officers were provided "Offender Compliance Checklist" forms to fill out for each residence visited. On these forms the officers were to record whether there were computers in the residence, whether the subject gave consent to search, whether there were children living in the residence, whether a computer was seized, whether a consent form was signed, and whether there were children then present. The form contained a place for the offender and the officer to sign and date the form. Def. Ex. G.[1] Other than the status of the subjects as sex offenders, the officers did not know the subjects' specific convictions or supervision requirements, if any. The officers were required to report to the Sheriff's Office any violation of the registration or supervision requirements.

### Deputies' entry into residence

8.     On August 2, 2011, Jefferson County Deputy Sheriffs Anthony Michael Barbato[2] and Brett Thebeau were assigned to participate in the joint sex offender

---

[1] No such form for defendant Beckmann was offered into evidence during the suppression hearing.

[2] Deputy Barbato, as of August 2, 2011, had been trained in the St. Louis County Police Academy and had been employed as a reserve officer of the City of St. John, Missouri; he was assigned to patrol duties. On August 2, 2011, he had been with the Jefferson County Sheriff's Office for about 6 months.

residence verification operation with the Marshals Service. At 7:25 a.m., they arrived at 2842 Glen Haven Dr. to verify that registered sex offender Paul A. Beckmann resided there. They were in uniform with usual police equipment and they drove a marked police patrol car. Their plan was to verify not only that he lived there, but to find out what guidelines he was required to follow, and to verify that he was following them. The officers parked their vehicle on the side of the street opposite Beckmann's house. 2842 Glen Haven Dr. is a two-story residence with an attached garage and a small front yard.

9.      The officers walked together to the front door. Officer Barbato knocked on the door. Neither officer had his firearm drawn. Paul Beckmann quickly answered the knock and opened the door. Beckmann was wearing a tee shirt and pajama pants. The officers identified themselves. They told Beckmann that they were there to verify his address and that, because this was an expanded check, they needed more information than just the address verification. Officer Barbato also told Beckmann that they were working with the U.S. Marshal's Office and that they wanted information about whether he was following any required guidelines. Officer Thebeau asked Beckmann if he minded if they stepped inside the residence. Beckmann indicated they could come into the residence. He then stepped back so the officers could enter and all three walked into the living room on the right.[3]

### Deputies' observations in residence and statements to them

10.      In the living room, Officer Thebeau sat on a couch and Officer Barbato stood next to him, across from Beckmann who was standing. Nothing in the living room looked out of the ordinary. The officers saw a closed laptop computer on the coffee table

---

[3] Deputy Barbato and defendant Beckmann each testified that registered sex offenders are required to cooperate in the address verification procedure. However, the express source of this requirement was not placed in evidence, even in the supplemental evidentiary hearing, as is explained below. No document shown to the undersigned expressly stated that Beckmann was obliged to allow the officers to enter his residence.

in the living room.   Officer Barbato asked Beckmann whether he was on probation or parole,  if he had any restrictions, whether he was allowed internet access, and whether there were any electronic items he was or was not allowed to use.  Beckmann said he had no restrictions and that he could lawfully have a computer.   The deputy had no information that Beckmann's statement was inaccurate.   Officer Barbato asked Beckmann whether he could look at the contents of the laptop computer.  Beckmann answered in the affirmative and handed the laptop to him.   Beckmann then stated, without being questioned, that he normally uses the laptop for work.

11.     To access the contents of the laptop Officer Barbato merely had to open it; no password was necessary to do so.  Officer Barbato checked the laptop's recent internet history and then its "localized" folders.  Officer Barbato did so to be sure there was no illegal content on the computer or guideline-prohibited content, Beckmann having said he had no restriction.   The officer looked at the names given to the directories and to folders inside the directories.

12.     While Officer Barbato was examining the laptop's content, Deputy Thebeau asked Beckmann if he could show the officer the rest of the residence. Beckmann said "Yes" and led Deputy Thebeau upstairs.[4]  Remaining downstairs, Barbato found nothing on the laptop of investigative value.

13.     After they went upstairs, Deputy Thebeau and Beckmann conversed about whether there was any other computer in the house and what the computers contained. Another computer was located in an upstairs room that was used as an office.  Deputy Thebeau stated loudly enough for Barbato to hear that there was another computer upstairs in the office.

14.     After looking at the laptop downstairs and finding nothing of interest, Deputy Barbato heard Deputy Thebeau ask Beckmann whether the officer could use his

_____

[4] At that time the deputies did not know if there was anyone else in the residence.  From the time the officers entered the house, Beckmann was polite, calm, and very cooperative.

bathroom.  Barbato heard Beckmann tell Thebeau he could use the bathroom and he gave the deputy directions to it.  When he heard this exchange, Deputy Barbato closed the laptop, left the living room, and walked upstairs.  Barbato did this out of concern about the safety of Deputy Thebeau, now that no one was with Beckmann upstairs.[5]

15.    When Deputy Barbato reached the top of the stairs he saw a hallway to the left.  He did not immediately see Beckmann.  Barbato stepped into the hallway where he could see the bathroom on the right where Deputy Thebeau was.  On the left was the office area, approximately 5 feet from the stairs.  Barbato walked into this office area, which was where he had heard Beckmann walk after he directed Thebeau to the bathroom. Barbato had also heard Deputy Thebeau identify the office area as the location of second computer.  In the office area, which was approximately 10 feet by 14 feet in size, Deputy Barbato saw a computer desk with a computer monitor on it.  Barbato saw that the monitor was on and that Beckmann was on the floor on his hands and knees under the computer desk, facing away from Barbato.  Barbato saw that Beckmann appeared to be working ("messing around") with wires and something located near the tower on the top surface of the desk.[6]  Barbato could also hear the sound of physical items being manipulated by Beckmann.  Deputy Barbato was uncertain what Beckmann was looking for, but believed he could be looking for a weapon as well as some other item.

16.    Deputy Barbato spoke up at this time and asked Beckmann if this was his other computer.  Beckmann appeared startled, backed out from under the desk, stood up, and said that it was.  Then Beckmann said, "You are interrupting my Facebook time."

_____

[5] During the suppression hearing, Deputy Barbato testified also that he wanted to be sure Beckmann "wasn't going through anything he shouldn't be."

[6] Beckmann testified at the suppression hearing that, when Deputy Thebeau was in the bathroom, he was in the bedroom with his girlfriend and that he never was on the floor of the office under the desk working with wires, as Deputy Barbato testified.   After

Beckmann remained cooperative.  Deputy Barbato asked Beckmann whether he could have a look at that "computer" also.[7]  Given the voluntary consent given for the deputy to search the laptop computer downstairs, both the deputy and Beckman understood the deputy to be asking for consent to look into this computer's database.  Beckmann said Yes.

      17.     Deputy Barbato pulled up a chair next to the desk.  On the top of the desk were the computer's tower and two external hard drives.  The two hard drives were connected to the tower with data cords.  However, power cords from the external hard drives went off the top of the desk to the floor.  Deputy Barbato got out of the chair and looked under the desk to where he saw Beckmann moving around.  He saw data cords linking each of the drives with the tower on the top of the desk.  He also saw that a power cord from at least one of the hard drives was unplugged from the electrical outlet.  Deputy Barbato plugged the power cord into the outlet so that one or both of the external hard drives would operate.  Barbato believed Beckmann had unplugged the power cord.

      18.     After he plugged in the power cord, Deputy Barbato got up and sat in the chair at the desk.  He then used the computer mouse with the monitor to activate the computer.  Barbato thought the computer desktop displayed on the monitor looked normal, although it had icons he was unfamiliar with.  By this time Beckmann had walked out of the room.   Barbato did not know where he went.  With no one else in the room, Barbato then clicked on the Start button and opened the "My Computer" portion of the Windows operating system.  In this way, Deputy Barbato observed the computer's hard drives, including the two external hard drives that were plugged in.  He saw that

---

considering the entirety of the evidentiary record, the undersigned credits the officer's testimony that Beckmann was under the desk working with wires.

[7] At this time, Deputy Barbato understood the term "computer" to include the attached external hard drives, although neither he nor Beckmann used the term "hard drive."  Also, Deputy Barbato did not ask for and Beckmann did not give express consent for the deputy to plug in the power cord in order for the hard drive to operate.

there were two external hard drives connected to the computer. He could not determine the hard drive contents from the names of the drives.

19. Deputy Barbato then opened one of the external hard drives. He saw folders and subfolders with names such as "Patriot" and "Unfinished." These names did not seem out of place. Deputy Barbato opened the folder named "Unfinished" and saw that it contained several files. The names of these files contained numbers followed by abbreviations which were suggestive of ages, e.g., "14 yo," "10 yo," and then sexual words such as "masturbation," "sex," and "oral." Deputy Barbato believed these file names indicated that the files contained child pornography. Barbato did not open these files. He did not further search the computer or the external hard drives. And he did not further physically search this office room area.

20. By that time, Deputy Barbato had been in the office by himself for 5 to 10 minutes. Deputy Thebeau had left the bathroom and at Deputy Barbato's request entered the office. Barbato said, "Take a look at this," pointing to the file names. Deputy Thebeau did not open any of the files. Thebeau asked Beckmann to step into the room, which Beckmann did.

21. When Beckmann entered the room, he appeared somewhat nervous. Beckmann asked why he was asked to enter the room. Deputy Thebeau asked Beckmann whether he knew what the file names on the monitor screen involved. Beckmann immediately appeared nervous, he crossed his arms breathing heavily, and he said he did not want to say anything about that.

22. At that time, the deputies detained Beckmann out of a concern for officer safety because he had been seen on the floor under the desk. They did this also to protect the digital equipment's contents as evidence. Deputy Barbato now thought that, when Beckmann was on the floor under the desk, he could have been attempting to destroy evidence by affecting the operation of the computer. Also, by then the officers knew

there was another person in the residence.[8]   Beckmann was handcuffed and taken downstairs to the living room where the officers had him sit on the couch.  The deputies asked Beckmann no further questions and they did no further search of the residence.

## Det. Martin's entry into residence and statements to him

23.   Next, around 8:00 a.m., Deputy Thebeau phoned the deputies' immediate Sheriff's Office supervisor.  Jefferson County Det. Virgil Martin, a forensic investigator who specializes in computer crime,[9] was dispatched to Beckmann's residence.  He arrived in about 20 minutes.  During this period, Beckmann sat on the couch downstairs and the deputies did not question him.

24.   Det. Martin drove there in a police patrol car, but without the lights or siren activated.  He arrived about 8:30 a.m.  He was dressed in business casual dress, wearing khaki pants and a collared shirt.  He was armed and wore a badge.  Before Martin entered the residence, he was met outside by Deputy Thebeau in the residence driveway. Thebeau told him that he and Deputy Barbato had been conducting sex offender address verification checks, that they had obtained consent from Beckmann to search his computer, and that Barbato had observed file names on the computer that indicated child pornography.

25.   Martin entered the residence and went to the downstairs living room area where Beckmann and Deputy Barbato were.   Beckmann was sitting on the couch.

_____

[8] At some point in time the deputies learned there was another person in the residence, a woman friend of Beckmann.  Out of a concern for safety, the deputies had the woman remain in an upstairs room.  At no time during the time the officers were in the residence did the woman give any consent to the officers for any purpose.

[9] Det. Martin has received training and certification in this investigative area.

Deputy Barbato was standing near Beckmann.[10]   When Det. Martin walked into the room, Beckmann was unhandcuffed.

26.    Det. Martin told Beckmann his name and that he was from the Jefferson County Sheriff's Office.   Martin sat down in a chair across from Beckmann.   Martin asked Beckmann whether he would sign a written consent to search form so Martin could search his computers.   Beckmann said he would rather not do so.   Martin then asked Beckmann whether he had ever been convicted of child pornography.   Beckmann said he had been convicted of that back in 2001.

27.    At that time Det. Martin advised Beckmann of his constitutional rights to remain silent and counsel.   He did so using a preprinted 2-sided form, Government Exhibit 1.   Martin read the rights orally to Beckmann as he read them from the form.   As they proceeded through the 6 numbered statements, Martin asked Beckmann whether he understood each right; each time Beckmann said, "Yes."   At Martin's direction Beckmann wrote his initials next to each statement.

28.    Next, Martin had Beckmann read the following paragraph, captioned "Waiver of Rights," out loud:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Gov. Ex. 1 at 1.   Martin asked Beckmann whether he understood this paragraph. Beckmann answered, "Yes."   Beckmann understood his constitutional rights to counsel and to remain silent and he understood this paragraph.   He so indicated by signing the

---

[10] Deputy Barbato was standing near Beckmann as a usual security measure taken whenever police are inside a residence.   During this time, Beckmann was not restrained. He could walk around in the residence, as long as he was accompanied by an officer. After Det. Martin arrived and began speaking with Beckmann, Deputies Barbato and Thebeau remained at the residence to provide security.

form at 8:23 a.m.  Then Det. Martin signed the form as a witness.  On the back side of this form is an area for a statement to be written.  Through this area was written a large "X" with the writer's initials which indicated that no statement would be written there. Also present in the room was one of the deputy sheriffs who did not participate in the interview.

29.     Next, Det. Martin asked Beckmann whether he knew what child pornography was.  Beckmann stated yes.  Martin asked him whether he was familiar with any peer-to-peer network.  Beckmann responded, "Limewire."   Martin asked him who his internet provider was.  Beckmann said, "ATT Uverse."  Martin asked him whether he usually accessed the internet through the desktop computer or through the laptop computer.  Beckmann responded, "I use the desktop computer upstairs because it plays games faster."   Martin asked Beckmann whether he had ever downloaded child pornography on his computer.  Beckmann answered in the affirmative.  Martin then asked him whether he had recently downloaded child pornography.  Beckmann said he "would rather not answer that."   Martin understood from this response that Beckmann did not want to answer questions about the current presence of child pornography on the computer.

30.     As of this time in the interview, Beckmann had not asked for a lawyer. Because Beckmann had previously said he would not consent to a search, Det. Martin ended the interview.  Then, Det. Martin told Beckmann that he was going to contact Sgt. Adam Kavanaugh and have him come to talk with Beckmann.  When he heard this, Beckmann did not voice any objection or tell Det. Martin not to let anyone else inside the residence.  Det. Martin's interview of Beckmann lasted between 10 and 15 minutes.

## Sgt. Kavanaugh's entry into residence, statements to him, and seizure of computer equipment

31.    Next, Det. Martin phoned St. Louis County Police Sgt. Adam Kavanaugh who investigates child pornography crimes.[11]  Det. Kavanaugh was on his way to work when he received the call on his cell phone.  On the phone, Det. Martin told Sgt. Kavanaugh what had been learned in the investigation that day, including the conduct of the sex offender location survey, that Beckmann had consented to the deputies searching his computers, what the deputies and he had seen, and that there might be child pornography on the computer in the residence.    Approximately 20 minutes later, Sgt. Kavanaugh arrived at the residence.  He drove an unmarked vehicle and wore blue jeans and a collared shirt.  During this 20 minute wait for Sgt. Kavanaugh to arrive, no one questioned  Beckmann, no one searched the residence, and no one looked further into the computers' data contents.  An officer remained with Beckmann throughout the police presence for security purposes.

32.    Before Sgt. Kavanaugh entered the residence, he spoke with Det. Martin outside in the driveway.  In about a five minute conversation, Det. Martin told the officer what information the police had learned so far.   Martin told Kavanaugh that, after discovering suspicious file names on the computer he advised Beckmann of his Miranda rights, and that Martin had tried to question him.  Martin told Kavanaugh that Beckmann had signed a warning and waiver form, but he did not sign a consent to search form. Then both officers entered the residence[12] and went to where Beckmann was sitting in the

---

[11] Det. Kavanaugh, a police officer for 21 years, had been with the St. Louis County Police Department for 11 years.  On that day he was the supervisor of the Special Crimes Unit, which investigates child pornography, among other types of crimes.  He has received training in investigating child exploitation and child pornography.

[12] Immediately before he entered the residence, Sgt. Kavanaugh activated a small pocket video recorder.  This recorder was in his pocket and was not visible to anyone else. Government Exhibit 2 is a compact disk on which is recorded all the audio the device

living room.    With Beckmann, who was seated on the couch, at that time were both of the Jefferson County deputies.  Beckmann was not handcuffed or shackled.

33.    a.    When Sgt. Kavanaugh entered the room, he introduced himself, extended his hand to shake Beckmann's, but Beckmann declined to shake hands.   To Kavanaugh Beckmann appeared to be a little upset, nervous, quiet, and "standoffish".  Kavanaugh then sat in a chair directly across from Beckmann and began to interview him.

b.    He explained who he was to Beckmann.  No firearm was displayed.  At that time, Sgt. Kavanaugh knew Beckmann had been convicted of possessing child pornography.  Kavanaugh asked Beckmann when the conviction occurred and whether he was still on probation or other supervision.  He and Beckmann discussed the therapy he had received both in prison and while on supervision.   Sgt. Kavanaugh asked Beckmann, based on all that had been found in the house, if it was time to go back into therapy.  Beckmann answered in the affirmative.  This answer indicated to Kavanaugh that the computer file names accurately signified that the contents of the files involved child pornography.

c.    Next, Kavanaugh asked Beckmann whether there was a lot of child pornography on the computer.  Beckmann said he was not going to answer that question.  Kavanaugh then said, "That's fine.  You do not have to."

d.    Kavanaugh asked him whether he had any file sharing programs, like Limewire, on his computer.  Beckmann, after initially answering in the negative, discussed Limewire and other peer-to-peer software on his computer.

---

recorded during Kavanaugh's subsequent interview of Beckmann.   Beckmann was unaware his interview by Sgt. Kavanaugh was being simultaneously recorded.   Also received into evidence during the suppression hearing was a transcript of the audio recorded interview, Government Exhibit 3.  In making findings of fact in this Order and Recommendation the undersigned has considered both the audio recording and the written transcript of the recording, Government Exhibits 2 and 3.

e.　In answer to questions, Beckmann said he had internet access through ATT and used Yahoo and another application for email.

f.　Kavanaugh told Beckmann that he appreciated Beckmann talking to him. Beckmann responded that he did not have a choice. Kavanaugh then said:

> Well, you have a choice. I mean, any time you tell them I'm done, leave me alone, leave me be. I'm here talking to you, perfectly voluntarily, you know, I'm not holding you here, I'm not keeping you here. You're not under arrest. If you were under arrest, I'd have handcuffs on you right now. That's not uh, not gonna happen. You know? That's why they called me, just come in and talk and find out what's going on. Uh, alright, so I know you have the issues with signing forms according to, to uh Detective Martin. Uh, but, uh, uh, and we don't have, you don't have to sign the form. If you want to give me consent without signing the form, to look at the computer, you can give me consent to look at it. You don't have to sign the form. And a lot of people are sticklers about, I don't want to put my signature on a form. I mean, but you tell me yes, I can look at that computer, then we'll look at the computer. If you say no, then we'll deal with it in other manners on how we look at it. So, uh, but you don't have to sign a form. That's that's (inaudible) hang ups. Do you wanna give us consent to look and see what's on that computer?

Beckmann's response was inaudible to the recording device. Gov. Ex. 3, at 5.

g.　Kavanaugh then said, "No? Okay. Is that because there's stuff on there that shouldn't be on there?" Beckmann replied, "That's because, until I officially meet with a lawyer." Kavanaugh said, "Okay, so you saying you want a lawyer." Beckmann said, "I'm, I'm . . . not yet, I'm." Kavanaugh: "Okay." Beckmann: "I'm not (inaudible)." Kavanaugh: "I want to just, I want to be clear because if you're asking for a lawyer I'd, I'd stop talking to you in a minute." Beckmann: "I, I will answer certain questions, certain ones I won't." Kavanaugh: "Okay." Beckmann: "I will give certain permissions and certain permissions I won't." Kavanaugh: "Okay." Beckmann: "Until I have a lawyer." Id.

h.　Then, Kavanaugh said:

Okay, uh, well (inaudible) I tell you what. We don't need to look at it right here, right now, but we're gonna want to take that computer from the house without searching it, without looking at it here. And that will require us, what it requires us to do, as you said no, I would fill out what they call an affidavit and a search warrant, present it to a judge with what facts we have and then he would determine whether or not to let us look at your computer, okay? We can do it that way or you can give us consent. It's kind of the two options we have. The simpler option, of course, for us is for you to, you say yes. The more complicated option for us is which is no problem, we do them all the time, is to type up a search warrant and try to get permission from a judge. I'm not saying he's gonna give us permission. If you don't give us permission, he will, I'm not saying any of that. I'm just saying we fill out the affidavit, the search warrant, we present it to a judge, you know, which in this case will probably be a federal judge is where we would take it to. And he would look at the facts and determine if that's enough to look at what's on the computer. So, you know, that's kind of your choice how you want us to handle that. So, would you prefer for us to do it that way as opposed to giving us consent?

Gov. Ex. 3, at 6. To this Beckmann responded, "I, right at this moment I'd prefer to call a lawyer and see what they advise me to do." Kavanaugh said, "Okay, all right, well, we're uh, you got, you got a phone number for a lawyer you want to call?" Beckmann responded, "It is up in my wallet." Id.

      i.     Then, Kavanaugh and Beckmann walked upstairs and into a back bedroom.[13] In this bedroom was Beckmann's small pet dog who was barking. Beckmann assured Kavanaugh that the dog frequently barked but did not bite. Beckmann entered this bedroom, found the attorney's card, left the bedroom, and both he and Kavanaugh walked to the nearby office area on that floor. Kavanaugh asked who Beckmann's attorney was; Beckmann gave him the name. Kavanaugh said, "Dan? I

---

[13] Also on this floor was another living room area. At that time, Beckmann's female friend, who had been in the residence when the police first arrived, was seated in this living room in the presence of a uniformed deputy. Sgt. Kavanaugh never spoke with Beckmann in this upstairs living room area.

know Dan." There, in Kavanaugh's presence,[14] Beckmann used his own phone and called the number of an attorney's office. He was connected with attorney Tony Muhlencamp. Kavanaugh told Beckmann that he would like to speak with the attorney also, to tell the attorney what was going on. Beckmann activated the speaker phone.

j. After his call was answered, Beckmann said to the receptionist:

> I have police here at my house that are wanting to question me in regards to a case and I need to speak with a lawyer to get some advice before I answer or give them certain permissions. I hired uh Dan Juengel um, about 10 years for, for a case. My name is Paul Beckmann. B-E-C-K-M-A-N-N. Uh, suspicion of child pornography on a home computer. Thank you. My phone number is, uh, xxx-xxx-9220. Yes. Uh, I have a previous conviction for possession of child pornography, okay? Two Jefferson County Sheriffs came today to do address verification. Uh, they said that they were doing an expanded update of my records and they asked to look around my house and to look at the computers. Yes, they are. There is also a detective here who's wanting to know either get, from me to either give him permission to search my computer or go through the judge to get a uh, search warrant to take it. And I told them I wasn't gonna do either one until I talked with a lawyer to figure out what in the hell I can do.

Id. at 7. Sgt. Kavanaugh conversed with attorney Muhlencamp on Beckmann's speaker phone. On the phone, attorney Muhlencamp advised Kavanaugh that his client would not be making any more statements to the officers and that he was not going to give any further consents. The attorney told Beckmann to allow the officers to take the equipment and to not fight with the police about that. Beckmann said he would comply with this advice. The attorney then advised his client to call him later after the officers had left with the items. Very shortly thereafter Sgt. Kavanaugh turned off his recording device.

34. The officers then began to inventory the items to be seized in the office and Beckmann turned off the phone's speaker and spoke with the attorney. Sgt. Kavanaugh

---

[14] Sgt. Kavanaugh stayed with Beckmann for security purposes, because the officers had not searched and secured the residence for weapons.

listed the items being seized on a Jefferson County Inventory Report form, Government Exhibit 4.[15]

35.     When Sgt. Kavanaugh finished listing the seized items on the inventory form, he handwrote on it "Giving consent to Remove From Residence Only," he signed his initials at this sentence, and then gave it to Beckmann to sign. Beckmann insisted that, before he signed, lines had to be drawn through open areas of the form so that more items could not be added to the form. Sgt. Kavanaugh had no problem with this and he drew lines for this purpose.

36.     Beckmann signed Government Exhibit 4 at 9:50 a.m. Thereafter, Sgt. Kavanaugh asked Beckmann no more questions. Beckmann was not under arrest. Because Det. Martin was a forensic examiner, Sgt. Kavanaugh had him physically seize the listed items.

37.     Thereafter, between 10:00 and 10:30 a.m., all the officers left Beckmann's residence. At no time during any interview or when any officer was with him did any officer threaten Beckmann in any way or make any promises to him.

38.      When the investigation concluded at the residence, Dep. Thebeau took photographs of the relevant areas of the scene and left the residence.

39.     Det. Martin left the residence with the seized items. He had been there about an hour. He took the seized items to his police lab in Festus. There, Martin placed the items in his evidence locker, to which only Martin had access. Det. Martin did not immediately begin analyzing the items. Rather, he waited for Sgt. Kavanaugh to obtain a search warrant authorizing the examination of the seized equipment.

---

[15] Eight items are listed on Exhibit 4: (1) 1-Compaq computer SN CNF0527L1P; (2) 1-ASUS K52F, SN ACN0BC000S5JT50G; (3) 1-Olympus digital camera, SN 48S08135; (4) 2-Sandisk thumb drives; (5) 1-Maxtor external drive, SN 2HAU302R; (6) 1-WD external drive, SN WCAV55163042; and (7) 1-ASUS tower computer, SN B1PDCG0009RA. All these items were described as being seized from either the "office area" or the "office." Both terms refer to the one office area on the upstairs floor of the residence.

**Issuance of federal search warrant**

40.    a.    On August 15, 2011, Sgt. Kavanaugh applied for a warrant from this court authorizing the search and analysis of the eight items seized from Beckmann's residence on August 2, 2011, and listed in the Inventory Report, Government Exhibit 4. In support of his application, Sgt. Kavanaugh submitted his written, sworn affidavit. In his affidavit, Sgt. Kavanaugh described his law enforcement experience investigating the online exploitation of children and trafficking in child pornography, in violation of federal law. Gov. Ex. 5, Affidavit, Introduction at ¶ 1.

b.    The affidavit described the information Sgt. Kavanaugh learned from Det. Martin. This information included Deputy Barbato's consensual search of Beckmann's computer and the discovery of "suspicious file names" which indicated sexual activity and the involvement of minors. The affidavit set forth Beckmann's prior felony conviction in this court for possession of child pornography and his sentence. Id.

c.    The affidavit stated that Det. Martin told Kavanaugh, before he entered the residence, that he had obtained from Beckmann a signed Miranda rights warning and waiver form, which stated that Beckmann had understood these rights and waived them. Id., Investigation at ¶ 2.

d.    The affidavit described some of Sgt. Kavanaugh's interview with Beckmann. Kavanaugh asked Beckmann if he then had child pornography on his computer, to which Beckmann "stated that he did not wish to answer the question." Kavanaugh told Beckmann about his suspicions about the file names and asked Beckmann for consent to search the computers at the residence. Beckmann "declined" to allow Kavanaugh to search the computers. Kavanaugh asked about and Beckmann described his therapy. Kavanaugh then asked Beckmann whether "it was time to start back again" and [Beckmann] stated, "Yes." Id., Investigation at ¶ 3.

e.    The affidavit stated that, when Beckmann said he wanted to call an attorney, all questioning stopped, and that Beckmann spoke to the named attorney. The

affidavit described their conversation. Beckmann also spoke with the attorney on the phone. Ultimately, Kavanaugh was advised by the attorney that Beckmann would not prevent the removal of the items of evidence from the residence, but that Beckmann would not consent to the search of the items. Id., Investigation at ¶ 4. Beckmann signed a written form consenting to the removal of the eight items from the residence. Id., Investigation at ¶ 5.

      f.    The affidavit stated that Deputy Barbato described the computer file names he had observed on Beckmann's computer, which observation had been initially consented to by Beckmann. Both Barbato and Kavanaugh believed the file names indicated child pornography was in the files. Id., Investigation at ¶¶ 6, 8.

      g.    The affidavit next described the investigative techniques that the law enforcement officers would use to determine whether the seized items contained evidence of child pornography. Id., Investigation at ¶ 7.

      h.    On August 15, 2011, at 9:54 a.m., Magistrate Judge Terry I. Adelman issued the search warrant for the eight seized items. The warrant provided in part:

> **YOU ARE COMMANDED** to execute this warrant on or before August 29, 2011.
>
>              \* \* \*
>
> Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.
>
> The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Terry I. Adelman.

Id., Search and Seizure Warrant.

## Execution of search warrant

41.　　On August 15, 2011, Sgt. Kavanaugh brought Det. Martin the search warrant he obtained from the federal district court which authorized the analysis of the items seized from the Beckmann residence.  Det. Martin filed the search warrant away.

42.　　After working on cases other than this one, Det. Martin began his analysis of the seized equipment on November 11, 2011.[16]  When he analyzed the seized equipment, he first made an image copy of all the data on each of the hard drives seized, the 2 external hard drives and the hard drive in the computer's tower.  Then, rather than analyze the actual items seized, he analyzed the hard drive copies.  Det. Martin found many images of child pornography, both still photos and videos, on the seized equipment.  Most of the child pornographic images were found on the desktop's hard drive, which he searched on January 24, 2012.

43.　　When he finished his analysis, Det. Martin gave Sgt. Kavanaugh his written analysis report, identified as a "supplemental report" and dated April 25, 2012.  This report was added to the overall report.  Det. Martin's report of his interview with Beckmann had already been included in the earlier portion of the overall report.

## Search warrant returned

44.　　On November 15, 2013, Sgt. Kavanaugh returned the warrant to Judge Adelman.  The back side of the warrant contained the Return portion of the warrant.  In the box captioned "Inventory of the property taken and name of any person(s) seized:", Sgt. Kavanaugh handwrote the same items list that he had given to Beckmann on August 2, 2011 (Findings 34, 35, 36), in the Inventory Report, Gov. Ex. 4.  Id., Search and Seizure Warrant.  Sgt. Kavanaugh did not return the warrant sooner because he forgot to

------

[16] Det. Martin did not ask the court for more time to execute the search warrant.  He leaves it to the investigators to ask for more time, and they normally do so.  That was not done in this case.

do so.   He did not intend to prejudice the defendant's case or delay the proceedings by not returning the warrant sooner.

## DISCUSSION

Defendant has moved to suppress both the statements he made to the officers and the physical evidence obtained by the seizure and analysis of the digital electronic equipment seized from his residence on August 2, 2011.

In support of his motion to suppress the statements he argues (1) his statements resulted from the officers' unlawful entry into his residence; (2) the officers failed to advise him of his <u>Miranda</u> rights before questioning him; (3) his statements were not voluntary; (4) his statements were the result of his unlawful detention; and (5) he did not waive his right to counsel.

In support of his motion to suppress the physical evidence defendant argues (1) the officers' entry into his residence violated the Fourth Amendment, because the officers told him that they needed to enter his residence; (2) while he gave the officers consent to search his laptop computer, he did not give any officer his consent to search his desktop personal computer; (3) defendant was unlawfully detained inside the residence; (4) he did not consent to the seizure of the items from his residence; (5) the showing of probable cause for the issuance of the federal search warrant was tainted by the prior unconstitutional acquisition of evidence; (6) the search warrant affidavit contained false statements; (7) the search warrant was not executed by the August 29, 2011 deadline stated  on the search warrant; and (8) "a receipt of the inventory of the property contained on the computer was <u>not</u> provided to the Defendant [following its analysis] and a delayed notice was not authorized."[17]   The issues raised by the motions are best addressed in the order presented by the facts of the case.

---

[17] (Doc. 28 at 4.)

## Deputies' entry into residence

Deputies Barbato's and Thebeau's walking up to the front door of defendant's residence and knocking on the door did not violate the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[18] Defendant had a reasonable expectation of privacy under the Fourth Amendment in the curtilage of his residence, which is the area surrounding his home including the walk from the street to his front door.[19]

The deputies' entry into the curtilage was constitutionally reasonable. The Eighth Circuit Court of Appeals has ruled, "it does not violate the Fourth Amendment merely to knock on a door without probable cause."[20] Further, the deputies were engaged in a legitimate law enforcement activity. In Weston, the police had reports that stolen cars were on the premises of defendant's mobile home residence. They went there to follow up on the reports, "a legitimate law enforcement purpose."[21]

The deputies' legitimate law enforcement activity included not only verifying defendant Beckmann's residence but also learning whether he was subject to other supervision requirements and whether he was complying with them. Verifying his residence and learning whether he was subject to other supervision requirements did not require that they enter Beckmann's residence. Nevertheless, the officers could enter his

---

[18] U.S. Const. amend. IV.

[19] United States v. Weston, 443 F.3d 661, 667-68 (8th Cir. 2006).

[20] United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008).

[21] Weston, 443 F.3d at 666.

residence without a warrant if defendant voluntarily consented to their entry.[22] The government bears the burden of proving that defendant freely and voluntarily gave his consent, which "is not satisfied by showing a mere submission to a claim of lawful authority."[23]

In deciding whether defendant freely and voluntarily consented to the officers' entry into his residence, the court must consider the totality of the circumstances;[24] defendant's knowledge of his right to refuse consent;[25] his age, intelligence, education, and language ability;[26] how much defendant cooperated with the deputies;[27] defendant's attitude about the likelihood of them discovering contraband on his computer;[28] and any coercive act by the deputies.[29]

The deputies told defendant the truth about why they were there. They did not fabricate a ruse to gain his cooperation. They told him they were there to verify his residence because he was on the county's sex offender list. He understood this. They also said they needed more information, explained that this was part of a Marshals Service operation, and said they were interested in whether he had any required guidelines. No right of defendant limited the officers from pursuing an investigation into

---

[22] The warrantless entry into an area protected by the Fourth Amendment is lawful, if it was authorized by a resident's voluntary consent. <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983).

[23] <u>Id.</u>

[24] <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973).

[25] <u>Id.</u>

[26] <u>Id.</u> at 226.

[27] <u>United States v. Budd</u>, 549 F.3d 1140, 1146-47 (7th Cir. 2009).

[28] <u>United States v. Hathcock</u>, 103 F.3d 715, 720 (8th Cir. 1997).

[29] <u>United States v. Arciniega</u>, 569 F.3d 394, 398-99 (8th Cir. 2009).

more than residence verification. [30]  The officers violated no right of defendant by asking him if they could enter his residence.  He said they could and he stepped aside so they could enter.  The officers did not coerce Beckmann's cooperation by asserting police authority, refusing to leave his premises, or in some fashion indicating to him that he had no choice but to let them in. [31]  He voluntarily and clearly consented to their entry into his residence without a warrant, by saying they could enter, and by opening the door and letting them pass through.

There is no doubt that the legitimate law enforcement activity the deputies were engaged in was infused with reasonable concerns by the deputies and by the defendant.  The deputies knew from their early morning briefing that evidence of criminal activity, such as the possession of child pornography on a computer, by the offenders they were assigned to survey, was a possibility.  And, with his state law reporting, registration, and personal location requirements and limitations, defendant likely had reasons to cooperate with the deputies.  These reasons could have been to avoid problems from not cooperating in the survey operation and to avoid criminal prosecution because he knew child pornography was on the computer in his upstairs office.

The record is clear, as stated above in Finding 9 n.3, that both the deputies and the defendant felt defendant had an obligation to cooperate in the survey.  However, these facts are not legally significant in isolation.  No evidence indicated that the officers communicated, either expressly or impliedly, to defendant that he was obligated to facilitate their survey operation.  And no evidence indicated that defendant told them he thought he was so obligated.  Rather, these states of mind may be relevant when considering the totality of the circumstances of what happened on August 2, 2011.

---

[30] United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008) (citing United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006)).

[31] Spotted Elk, 548 F.3d at 655.

## Deputies' observations and defendant's statements to them

After the deputies lawfully entered the residence, they and defendant conversed. In the downstairs living room, deputy Barbato asked defendant questions about whether he was under court supervision, whether he was prohibited from accessing the internet, and whether there was any electronic device he was prohibited from using. Defendant answered these questions in the negative. Deputy Barbato asked whether he could look into the contents of the laptop computer that was seen in the open there. Defendant said he could do so and handed the laptop to the deputy; and he volunteered that he uses the laptop for work. Defendant's constitutional rights were not violated when he made these and other oral statements to the deputies.

The admissibility of a subject's custodial statements in response to police interrogation depends upon whether the defendant had been advised of his rights as prescribed by Miranda v. Arizona;[32] whether the defendant knowingly and voluntarily waived his Miranda rights;[33] and whether the statements were voluntary.[34]

However, if the subject's statements are not made during custodial circumstances, the paramount constitutional qualification for their admission as evidence is that they be shown to have been made voluntarily.[35] Statements are involuntary, if they were the result of government overreaching, such as coercion, deception, or intimidation, regardless of the mental condition of the defendant.[36]

---

[32] 384 U.S. 436 (1966).

[33] North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).

[34] Haynes v. Washington, 373 U.S. 503, 513-14 (1963).

[35] Berkemer v. McCarty, 468 U.S. 420, 440 (1984); Illinois v. Perkins, 496 U.S. 292, 297(1990).

[36] United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012).

The record is clear that, when Barbato and defendant first spoke in the downstairs living room, defendant was not in custody for <u>Miranda</u> purposes. The Eighth Circuit has stated:

> [W]hether a suspect is in "custody" is an objective inquiry that turns on two discrete questions: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.
>
> We have identified six non-exclusive factors for determining whether a suspect is in custody:
>
> > (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspected possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.
>
> The critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way.

<u>United States v. Diaz</u>, 736 F.3d 1143, 1148-49 (8th Cir. 2013) (citations to quotations omitted).

When the deputies and defendant first conversed in the downstairs living room, defendant was not in custody. The deputies had just entered the residence with the consent of defendant. Truly, the deputies did not tell defendant that their questioning was voluntary, that he was free to leave the residence, that he could tell them to leave, or that he was not under arrest. However, there was no restraint on defendant to leave, other

than the fact that he would have to change into daytime clothes (and probably in the presence of an officer for security purposes). Nothing the deputies said or did, other than to describe their law enforcement purpose for being there, made the atmosphere police dominated. And they did nothing and said nothing to coerce cooperation from defendant. A reasonable person in defendant's position would have felt he could have terminated the interview and leave. Therefore, the deputies did not need to advise defendant of his <u>Miranda</u> rights before speaking with him. [37]

Nevertheless, it is the government's burden to prove by a preponderance of the evidence that defendant's statements were voluntary.[38] The standard for the voluntariness of statements is "whether the [government] extracted the [statements] by threats, violence, or direct of implied promises, such that the defendant's will [was] overborne and his capacity for self-determination critically impaired."[39] Defendant's answers to their questions were voluntary. He had voluntarily consented to their entry into his home. Nothing transpired that he did not expect, except for possibly the request to look at the contents of his laptop.

> The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given. Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances, including characteristics of the accused and details of the interrogation. Whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual. The precise question is not whether [the subject] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented.

<u>United States v. Aguilar</u>, 2014 WL 715645 at *2 (8th Cir. 2014) (citations to quotations omitted). From the few circumstances that had occurred by the time deputy Barbato

---

[37] <u>Id.</u> at 1149.

[38] <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-69 (1986); <u>United States v. Williams</u>, 720 F.3d 674, 691 (8th Cir. 2013).

asked if he could look at the contents of the laptop, the undersigned concludes that defendant consented to this search.  He expressly answered the deputy in the affirmative and he handed the laptop to him.  It was obvious that defendant voluntarily consented.  Both of defendant's statements to the deputies and anything learned from the search of the laptop should not be suppressed.

Next, deputy Thebeau and defendant conversed about whether defendant would show the deputy the rest of the residence.  Without coercion, defendant voluntarily consented to the deputy accompanying defendant upstairs to look at the rest of the residence.  Both went upstairs.

Upstairs Thebeau and defendant conversed about whether another computer was in the residence and what might be in it.  Another computer was located in an upstairs office area and Thebeau communicated that information to deputy Barbato downstairs.  Thebeau then asked defendant whether he could use the bathroom.  Defendant consented and told Thebeau where it was.  Barbato heard this exchange and went upstairs, for security purposes.  He then knew that defendant was by himself, because Thebeau had gone into the bathroom.  Without getting defendant's consent, deputy Barbato walked upstairs.  Barbato's doing so without consent or a warrant was not a violation of defendant's rights under the Fourth Amendment.

The reason given by deputy Barbato for going upstairs was a concern that defendant might destroy evidence, if defendant was left by himself (to be sure defendant "wasn't going through anything he shouldn't be").  "Exigent circumstances exist if an objectively reasonable officer on the scene would have sufficient grounds to believe an exigency existed." [40]  A concern that defendant would destroy evidence if left alone, was not a legally sufficient reason in the circumstances of this case, because nothing the deputy knew indicated more than speculation that defendant might destroy evidence

---

[39] Id. (citations to quotations omitted).
[40] United States v. Poe, 462 F.3d 997, 1000 (8th Cir. 2006).

The laptop computer had been seen to be clear of child pornography. All deputy Barbato knew when he left to go upstairs was that defendant was a sex crime offender who had another computer upstairs. This was not enough. [41]

That said, deputy Barbato then knew that deputy Thebeau was going to be in the bathroom, and that defendant was alone upstairs. Barbato's walking to the upstairs level was lawful, because defendant had consented to deputy Thebeau going upstairs. Therefore, defendant had no legitimate expectation of privacy in that area, in these circumstances, to prevent Barbato from also going there. [42]

Now lawfully on the top floor, deputy Barbato violated no Fourth Amendment right of defendant when he observed in plain view defendant on the floor under his desk appearing to be attending to wiring related to his computer. [43] After this observation, the circumstances supported a reasonable belief that defendant would destroy evidence if given the opportunity. [44]

In these expanded circumstances, when deputy Barbato asked defendant whether this was his computer, defendant responded in the affirmative. In no way did the deputy coerce defendant into answering this question. Defendant voluntarily answered the question. And then defendant volunteered, without being asked, "You are interrupting my Facebook time." At this time, defendant's circumstances remained non-custodial.

---

[41] United States v. Ramirez, 676 F.3d 755, 765 (8th Cir. 2012).

[42] Cf. Frazier v. Cupp, 394 U.S. 731, 740 (1969) ("Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case").

[43] United States v. Hamilton, 591 F.3d 1017, 1023 (8th Cir. 2010) ("Having lawfully entered Hamilton's trailer and observed in plain view a clear indication that Hamilton had violated his parole conditions, the circumstances known by the officers justified their continued search").

[44] Cupp v. Murphy, 412 U.S. 291, 296 (1973).

Next, deputy Barbato asked defendant whether he could "look" at this computer and defendant said "Yes." The undersigned has found as a matter of fact that both defendant and Barbato understood this exchange to be defendant's express statement that the deputy could search the upstairs computer as defendant had given his voluntary consent for him to search the laptop downstairs.[45]

The issue now is whether, considering defendant's voluntary oral consent to search the upstairs "computer," Barbato exceeded the scope of this consent by searching one or both of the external hard drives situated adjacent to the computer tower. "When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization."[46] The standard of objective reasonableness dictates the scope of consent.[47] The scope of a search is generally defined by its expressed object.[48] Thus, the court must determine whether a reasonable person would have considered defendant's consent to a computer search to extend to his external hard drive.

In United States v. Herndon,[49] as a condition of probation, the defendant was required to consent to a probation officer "checking your computer and any software at any time for Internet capability or activity." During a search of his laptop, a probation officer saw an external hard drive detached from the laptop. He connected it to the laptop and saw that it contained child pornography. The defendant argued that the search of the external hard drive exceeded the scope of his consent. The court disagreed:

---

[45] Defendant argues that the later search affidavit falsely stated that defendant consented to the search of the upstairs computer and falsely stated that he was observed on the floor doing as deputy Barbato described. This statement in the affidavit was not false.

[46] Walter v. United States, 447 U.S. 649, 656 (1980).

[47] Florida v. Jimeno, 500 U.S. 248, 251 (1991).

[48] Id.

[49] 501 F.3d 683 (6th Cir. 2007).

Moreover, the language of Directive 5 can reasonably be construed to encompass the storage areas on Herndon's computer, including any peripheral drives, as the term "computer" is commonly understood to include the collection of components involved in a computer's operation. Herndon's reliance on United States v. Roark, 36 F.3d 14 (6th Cir.1994), for support of his position to the contrary is misplaced. In Roark, the Sixth Circuit held that police officers exceeded the scope of a woman's consent to search "her residence" when they proceeded to search a second house located on her property. As the government correctly observes, the analogy between a primary residence and an outbuilding-which are largely independent save their presence on the same plot of land-and a computer and its external hard drive-one of which is dependent upon the other for its function-is strained at best.[50]

In Blake v. Knieper,[51] the defendant consented to the removal of two computers for forensic inspection. The court found that the officers' conclusion that the consent encompassed two CDs sitting next to one of the computers, citing the Herndon definition of "computer." The court also looked to the object of the search, which was to find saved email messages, and implied that such data could also be found on two data CDs sitting next to the computer.[52]

In United States v. Miller,[53], the defendant unsuccessfully argued that the search of the attached external hard drive exceeded the scope of consent. The defendant had signed a written consent form that authorized the search of a computer. The object of the search was child pornography, and an external hard drive was connected to the computer.

---

[50] Id. at 690-91.

[51] 2009 WL 1689308 (E.D. Mich. 2009).

[52] Id. at 8.

[53] 450 F. Supp. 2d 1321 (M.D. Fla. 2006).

Further, the defendant had told the officer that the external drive contained downloaded files.[54]

Here, although the parties did not discuss the object of the search prior to the search, the nature of the visit implied that the officers were looking for evidence of sex-related offenses, which could reasonably be found on an external hard drive. Further, the officer's assumption that the external drive was part of the computer was reasonable due to the ordinary understanding of the word, "computer," and the fact that the external hard drive was connected to the tower.

The sole distinction between the instant case and the cases discussed above is that the officer saw defendant under the desk and, upon observing the area for himself, saw an unplugged power cord. Even assuming that defendant's conduct limited the scope of his consent, defendant did not object when the officer went under the desk to plug in the power cord but instead left the room. "[F]ailing to object to the continuation of a consent search makes the continued search 'objectively reasonable.'"[55]

Therefore, Officer Barbato's opening the upstairs computer data base and the external hard drive was objectively reasonable and worked no violation of the Fourth Amendment.

Deputy Barbato was doing what he was authorized to do by defendant's consent when the deputy saw the names of computer files that indicated that the contents of the files involved child pornography. He showed the file names to deputy Thebeau.

When deputy Thebeau asked defendant if he knew what the file names signified. At that time, defendant said he did not want to say anything about that.

In these circumstances, the deputies had reasonable grounds to believe that defendant's upstairs computer equipment contained child pornography and that defendant

---

[54] Id. at 1334.

[55] United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001).

had been seen on the floor appearing to affect the operation of the computer equipment. The deputies reasonably believed defendant would destroy this evidence if he could. They, therefore, reasonably detained defendant with handcuffs for further investigation.[56] The deputies called for support regarding the contents of the computer and the hard drives.

## Det. Martin's entry into residence and statements to him

Under Terry v. Ohio, defendant was lawfully detained for a reasonable period of time to allow further police investigation, based upon the information observed and learned by deputies Barbato and Thebeau. Because of the electronic and digital nature of the further investigation, the deputies reasonably called for a law enforcement officer with the necessary technical knowledge. Det. Virgil Martin was dispatched to defendant's residence. There, before entering the residence, he was briefed by deputy Thebeau about what the deputies had learned. Det. Martin entered to conduct his investigation.

Det. Martin found defendant in the downstairs living room. By that time, defendant was uncuffed. In the living room, although he was no longer handcuffed, defendant was in custody for Miranda purposes. He had been detained to prevent his access to the upstairs computer equipment that was reasonably believed to contain child pornography. In the living room he was now in the company of one or both deputies and Det. Martin. Nothing about these circumstances reasonably indicated that he was free to go about his business and leave.

Next, without advising defendant of his Miranda rights, Det. Martin asked defendant whether he would consent in writing to the officer searching his computers. Defendant declined to consent. Thereafter, until a search warrant was issued for this purpose, law enforcement did not search defendant's upstairs computer equipment.

---

[56] Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

Next, still without advising defendant of his rights to remain silent and to counsel, Det. Martin asked defendant if he had been convicted of child pornography. Defendant answered this question. (Finding 26.) Because defendant had not been advised of his Miranda rights and waived them, this statement by defendant should be suppressed.

Next, Det. Martin orally and in writing advised defendant of his constitutional rights to remain silent and to counsel. Defendant clearly understood these rights and expressly and voluntarily waived them in writing.

Defendant argues that, although he was advised of his Miranda rights, he did not understand these rights. This, he says, is evidenced by his later statements during the interview with Sgt. Kavanaugh that he did not have a choice about whether or not to cooperate and make statements. The undersigned disagrees. Sgt. Kavanaugh carefully explained to defendant that he did have a choice. That statement by defendant to Sgt. Kavanaugh about not having a choice was the result of defendant's actually knowing his available alternatives, to cooperate or not to cooperate, and his choosing to cooperate. Defendant's knowledge and understanding of his rights were demonstrated by him when, during his interview with Sgt. Kavanaugh, defendant spoke about his entitlement to counsel and his decision to answer some questions, but not others, and to "give certain permissions and certain permissions I won't."

Knowing and having voluntarily waived his Miranda rights, defendant answered Det. Martin's questions. These statements by defendant should not be suppressed.

## Sgt. Kavanaugh's entry into residence, statements to him, and seizure of computer equipment

Because of the child pornography nature of the investigation, Det. Martin called in Sgt. Kavanaugh, who specializes in this type of law enforcement investigation, to participate in the investigation. Within 20 minutes Sgt. Kavanaugh arrived. Again, as

had Det. Martin, before entering the residence, Kavanaugh was briefed about what the officers had learned that day.

Knowing from Det. Martin that defendant had signed a <u>Miranda</u> advice and waiver of rights form, Sgt. Kavanaugh did not again advise defendant of these rights.   Instead, he interrogated defendant and, without coercion from the officer, defendant answered questions.

During the interview with Kavanaugh, defendant and Kavanaugh both spoke with defendant's attorney by phone.  Defendant argues that the statements he made to counsel on the phone in the presence of Sgt. Kavanaugh should be suppressed, because they were privileged.  (Doc. 38 at 19.)  The undersigned agrees.   Although defendant knew he was in the presence of Sgt. Kavanaugh when he spoke with the attorney's receptionist and then to the attorney , defendant had no reasonable opportunity to confer with counsel in private.  Under the circumstances of this case, defendant's knowing that Sgt. Kavanaugh was present within hearing distance did not waive his right under the Sixth Amendment to effective assistance of counsel to confer with his counsel in private.[57]   Defendant's statements to his counsel in the presence of Sgt. Kavanaugh (Finding 33) should be suppressed.

The warrantless seizure and removal of the computer and related items from defendant's residence were reasonable under the Fourth Amendment.  The officers had probable cause to believe that these items contained child pornography.  While he did not consent to the officers searching the data bases of these items, with the advice of counsel, defendant expressly consented to the officers seizing and removing them from his residence.

Defendant argues that the consent form he signed was invalid because it was founded upon an illegal search and the claim that the computers were being taken regardless, based on exigent circumstances.  The undersigned concludes that defendant

---

[57] <u>Clark v. Wood</u>, 823 F.2d 1241, 1249 (8th Cir. 1987).

voluntarily signed the consent form. He was not coerced by the officers into signing. His consent followed the advice of his counsel that he not put up a fight over the officers' taking the equipment. While he knew the officers intended to seize the digital equipment in order to protect it from being destroyed, he nevertheless signed the form and was careful to line through open areas of the form so as not to allow space for anyone to add anything. In any event the officers were authorized by the Fourth Amendment to seize the equipment without a warrant. They had a reasonable expectation that defendant would destroy the evidence on the computer equipment if they did not protect it.

### Voluntariness of defendant's statements to the officers

The record and findings above are clear that most of defendant's statements[58] to the officers, whether to the deputy sheriffs or to Det. Martin or to Sgt. Kavanaugh, were responses to questions asked by the officers.

As stated, a person's statements are constitutionally involuntary, if they are the product of overreaching, such as coercion, deception, or intimidation, such that the subject's will or ability to not cooperate or to not make a statement was overborne.[59]

---

[58] On several occasions, defendant made statements spontaneously, not in response to questions. Soon after the deputy sheriffs entered the residence and after defendant handed them his laptop, he volunteered, without being questioned, that he normally uses the laptop for work. (Finding 10.) Later, when defendant and Deputy Barbato were in the upstairs office, defendant stated to the deputy, not in response to a question, "You are interrupting my Facebook time." (Finding 16.) Volunteered statements need not have been preceded by Miranda warnings. Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today").

[59] United States v. Perry, 714 F.3d 570, 574 (8th Cir. 2013.)

Such considerations also apply to the consent of an individual to a search by law enforcement.[60]

From the time the deputy sheriffs first entered defendant's residence until all of the law enforcement personnel finally left the residence with the seized items, no member of law enforcement coerced defendant into making any statement, including giving consent.

Defendant consented to Deputy Barbato looking into his laptop computer in the first floor living room. Barbato asked whether he could look at its content. Defendant expressly answered in the affirmative and handed the laptop to him. No evidence indicated that defendant's will or ability to refuse to allow the deputy to examine the computer was overborne.

None of the statements defendant gave to the deputies and officers was coerced and thus constitutionally involuntary. No one (not Deputies Barbato or Thebeau, or Det. Martin, or Sgt. Kavanaugh) overbore defendant's will regarding whether or not he would cooperate and answer the officers' questions. He knew he did not have to answer their questions, because he signed a rights form which he understood and because he invoked his right not to answer questions when he declined to answer questions about whether child pornography was on his upstairs computer equipment. He expressly told the attorney's office receptionist that there were questions he would answer and permissions he would give and other he would not. Defendant was clearly in control of the extent of his cooperation with the officers.

Defendant was not coerced into consenting to Deputy Thebeau looking into his laptop computer on the first floor. The deputy asked without any coercion or overbearing of defendant's will. And defendant consented. All the time the officer looked through the laptop, defendant did not object and withdraw his consent.

_____

[60] United States v. Crisolis-Gonzalez, 2014 WL 205035 at *5 (8th Cir. 2014) ("ruling the applicable standard for the voluntariness of a consent to a search is "whether consent was

**Defendant's detention**

Defendant argues that he was unlawfully in custody from the time deputy Barbato handcuffed him until all of the law enforcement officers finally left the residence. The undersigned disagrees that his detention was unlawful. As stated, defendant was handcuffed out of a concern that he would destroy the digital evidence that he was possessing child pornography. That concern was a reasonable one from the time the deputies saw him on the floor under his computer desk apparently doing something with the computer wiring. That concern lasted until the officers finally took the equipment from his residence for safekeeping.

Defendant argues that the two-hour-plus length of his investigative detention was excessive and not reasonable under the Fourth Amendment. The undersigned disagrees. "In determining whether a period of time is excessive, we must consider the 'law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" [61] Given the complexity of the circumstances, the investigation, the nature of the suspected contraband, and defendant's suspicious actions, the amount of time the officers detained defendant in his residence was reasonable.

Even if the length of time of defendant's detention exceeded that authorized by Terry v. Ohio, as demonstrated below regarding the issuance of the search warrant, the officers had probable cause to arrest defendant for possessing the child pornography on his computer and related equipment. [62]

**Issuance of federal search warrant**

---

given voluntarily").

[61] United States v. Maltais, 403 F.3d 550, 556-57 (8th Cir. 2005) (2 hour and 55 minute detention not excessive under circumstances of case) (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

[62] Beck v. Ohio, 379 U.S. 89, 91 (1964).

Defendant argues that the search warrant was unlawfully issued. The issue before this court when reviewing the validity of the issuance of a search warrant is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant.[63] Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit.[64]

The affidavit Sgt. Kavanaugh submitted to Judge Adelman on August 15, 2011, provided the judge with a substantial basis for finding probable cause to believe that the seized computer items contained child pornography. The affidavit described the investigative information provided to Sgt. Kavanaugh by Det. Martin, which included the suspicious computer file names seen by the deputy sheriffs. The affidavit included information about defendant's prior conviction for possession of child pornography and defendant's affirmative answer to Kavanaugh's question about whether it was time to return to therapy.

Defendant argues that without the information learned by the investigators, that the court determines was illegally acquired by the officers, the affidavit would be legally insufficient, and the evidence acquired by the execution of the search warrant should be suppressed.

The undersigned recommends that two of defendant's statements be suppressed. The first is defendant's statement to Det. Martin that he had been convicted of child pornography in 2001. (Finding 26.) This information was stated in Sgt. Kavanaugh's affidavit. (Finding 40b.) The record is clear that defendant stated this information to Det. Martin after the deputies had seen the computer file names which indicated the

---

[63] United States v. Stevens, 439 F.3d 983, 987 (8th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238-29 (1983)).

[64] United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

presence of child pornography. The affidavit clearly indicated this sequence of events. The second is defendant's statements to his attorney in the presence of Sgt. Kavanaugh. (Finding 33.) The search warrant affidavit did not specifically describe defendant's statements to his attorney, only that he had spoken to the attorney. The issuing judge's finding of probable cause is not demeaned by deleting these two items of information from the affidavit. The affidavit still provided the issuing judge a substantial basis for finding probable cause.

## Delayed execution of search warrant

Defendant argues that the search warrant was not executed within the required period of time; thus, any search pursuant to the warrant was outside the scope of the warrant. Indeed, the warrant gave the officers until a date certain 14 days from the issuance of the warrant to execute it. However, the warrant was not executed until almost three months later. The technical analysis of the seized equipment occurred between November 11, 2011, and January 24, 2012. This clearly violated the clear terms of the warrant.

The circumstances of the case indicate that defendant is not entitled to relief for the late execution. This is because defendant has not shown that he suffered any prejudice by the delay, i.e. that the information in the supporting affidavit had become stale at the time of execution or that the delay caused any other Fourth Amendment violation. Due to the nature of the computer storage media and the nature of the stored data, the delay in analyzing the seized items has not been shown to have altered the existence of probable cause when the warrant was executed by the technical analysis of the seized items.[65]

---

[65] United States v. Williams, 10 F.3d 590, 594-95 (8th Cir. 1993); United States v. Brewer, 588 F.3d 1165, 1173 (8th Cir. 2009).

## Delayed return of search warrant

As defendant argues, the return of the search warrant to the court occurred over two years after the seized items were analyzed. This was a violation of the Federal Rule of Criminal Procedure 41(f)(1)(D)'s requirement that the return occur "promptly." However, defendant has not shown that he suffered prejudice by the failure of Sgt. Kavanaugh to return the warrant to the court sooner than he did. The information on the inventory sheet when the warrant was finally returned was also on the receipt given to defendant when the items were taken from his residence. By the time the return was made on November 13, 2013, the indictment in the case had been returned by the grand jury and the relevant contents of the seized computer items had been disclosed to the defendant. (Doc. 17.)

The undersigned does not in any way condone the tardy return of the warrant to the court. However, no evidence indicated that anything other than inadvertence to Rule 41(f)'s requirement caused the delay or that the delay prejudiced defendant's case. Any entitlement to relief depends on a showing that the delay prejudiced defendant.[66]

Defendant argues that the return of inventory did not record what was found on the computers or the hard drives. Again, while this is the case, he has shown no prejudice therefrom. He received timely pretrial disclosure of this information and has not shown that his case would have benefitted from more timely disclosure.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the government's oral motion for a determination by the court of the admissibility or not of any arguably suppressible evidence (Doc. 12) is denied as moot.

_____

[66] United States v. Schoenheit, 856 F.2d 74, 76-77 (8th Cir. 1988) (defendant must show a deliberate failure to comply with Rule 41 or prejudice from noncompliance)

**IT IS HEREBY RECOMMENDED** that the motions of defendant Paul Beckmann (1) to suppress evidence generally (Doc. 13 oral motion); (2) to suppress statements (Doc. 27); and (3) to suppress physical evidence (Doc. 28) be denied with the exception of (a) defendant's statement to Det. Martin regarding his prior conviction for child pornography (Finding 26) and (b) defendant's statements to his counsel in the presence of law enforcement (Finding 33).

The parties have 14 days within which to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

<u>        /S/  David D. Noce            </u>
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 14, 2014.